THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| VIIVA GLOBAL, LLC, a Utah limited liability company; BOWEN, LLC, a Utah limited liability company, SH GLOBAL, LLC, a Utah limited liability company; AFFE HOLDINGS, LLC, a Utah limited liability company, and 402K, LLC, a Utah limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>XI JIAN ZHOU, an individual; GLOBAL LEGACY, LLC, a Nevada limited liability company; LI WEI WANG, an individual and JOHN AND JANE DOES 1 - 10,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING [141] PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No: 2:21-cv-00662<br><br>District Judge David Barlow<br>Magistrate Judge Daphne A. Oberg |

Before the court is Plaintiff Viiva Global, LLC ("Viiva"); Bowen, LLC; SH Global, LLC; Affe Holdings, LLC; and 402K LLC's Motion for Summary Judgment of Plaintiffs.[1] Plaintiffs seek partial summary judgment against Defendants Xi Jian Zhou and Global Legacy, LLC, on the grounds of breach of contract and unjust enrichment concerning commission payments pursuant to Part 1 of Exhibit D to Viiva's Operating Agreement.[2] For the reasons that follow, the court denies the motion.

---

[1] ECF No. 141.
[2] Mot. Summ. J. 2, 3–4.

1

## BACKGROUND

On July 18, 2018, the limited liability companies Bowen (managed by Zhigang "Bowen" Wang), SH Global (managed by Steinway Huang), Affe Holdings (managed by Devin Glazier), 402K (managed by Craig Johanson), SMACK Investments, and Global Legacy (managed by Xi Jian Zhou) executed the Operating Agreement for a limited liability company named Viiva Global.[3] Viiva is a "holding company involved in owning multi-level marketing and direct selling personal care, nutritional supplements, travel products, and other online technology and ecommerce companies."[4] It was launched in the spring of 2019.[5]

The six companies comprised Viiva's only members.[6] Global Legacy became the majority member with an 84.74% Membership Interest.[7] The other five members became the minority members, together representing 15.26%.[8] There are presently five members—SMACK Investment departed and was paid back its capital contributions[9]—and Global Legacy remains the majority member with an approximately 91% Membership Interest.[10]

According to the Operating Agreement, Viiva is a manager-managed LLC.[11] Mr. Huang, Mr. Zhou, and Kent Wood were its initial managers.[12] Mr. Huang also worked in various capacities at Viiva, including the role of Chief Operating Officer.[13]

In a sub-section titled "Self-Dealing," the Operating Agreement provides that "each Member and Manager . . . shall not participate or derive any benefit, directly or indirectly as a

---

[3] *See* Operating Agreement, ECF No. 141-2.
[4] *Id.* at 2.
[5] Glazier Aff. 4, ECF No. 164-2.
[6] Ex. A to Operating Agreement, ECF No. 141-2 at 45.
[7] *Id.*
[8] *Id.*
[9] Mot. Summ. J. 3 n.1.
[10] Third Am. Compl. ¶ 17.
[11] Operating Agreement 24.
[12] *Id.* at 25.
[13] Third Am. Compl. ¶ 23.

distributor of [Viiva] except for specific base of the tree positions referenced in Exhibit D to facilitate the growth and development of the network."[14] Exhibit D is titled "Viiva Positions."[15] The exhibit identifies the six original members of Viiva Global as "Parties for Exhibit D."[16] It instructs the Parties to cause Viiva "to establish 15 Base of the Tree Positions within the Viiva commissions tree prior to launch."[17] It further instructs them to "grandfather[] in" those 15 positions "at the highest rank and force commission qualified at the highest amount in the compensation plan."[18]

Exhibit D then provides that:

> Following the calculation of commissions that would have been earned by each of these 15 Viiva Positions, no payment will be made, but instead, Commissions expense will be reduced by the combined amount and added as a line item below Net Operating Income as Tree Distributions and amounts made to each of the Parties according to the following calculations:
>
> 1.     50% of the total will be allocated to all Parties equally . . . .
>
> 2.     The remaining 50% of the total will be allocated to the Parties by generating a sponsorship volume report of all Viiva19 sponsored positions allocated to each Party based on the attributed relationships of one or more Parties that led to those Viiva19 sponsored positions. In the system, while the positions show Viiva19 as the sponsor, the Parties will track an allocation of each position to one or more Parties. The allocation will take the 50% of the total commission to allocate times the total volume allocated to each Party, divided by the total volume from all Viiva19 positions in the sponsorship volume report in determining the amount to be paid to each Party. [19]

---

[14] *Id.* at 29.
[15] Ex. D to Operating Agreement, ECF No. 141-2 at 54.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

Payments pursuant to Exhibit D generally are referred to as "Top Company Position" or "Top Position" commissions.[20]

The Operating Agreement also provides for attorney's fees: "[w]ith respect to any future claim, dispute, suit or action connected with, relating to or otherwise arising under or with respect to this Agreement, the party substantially prevailing in such dispute, claim, or action shall be entitled to recover all reasonable attorney fees and out-of-pocket litigation costs."[21]

For purposes of summary judgment, it is undisputed that Viiva made payments to Global Legacy or Mr. Zhou in the amount of $3,603,881.74.[22] It is also undisputed that the payments to Global Legacy were for Top Company Positions commissions pursuant to Exhibit D,[23] but Global Legacy disputes that the payments to Mr. Zhou were "governed by the Operating Agreement."[24] Defendants also aver that the payments to Global Legacy in the amount of $3,054,560.09 "are part of Viiva Global's risk management fund . . . . and remain the property of Viiva Global."[25] Viiva's minority members aver that they have never been paid any Top Company Position commissions,[26] which Global Legacy partially disputes by pointing to purported payments to two of the minority members' managers.[27]

On October 20, 2021, Plaintiffs filed this action in state court.[28] Plaintiffs assert twelve causes of action against Defendants: Breach of Fiduciary Duty against all Defendants, Breach of Operating Agreement against Global Legacy and Mr. Zhou, Judicial Expulsion against Global

---

[20] Reply 8, ECF No. 164; Opp'n 4, ECF No. 161.
[21] Operating Agreement 38.
[22] Opp'n 4.
[23] *Id.* ("The payments to Global Legacy are for Top Company positions . . . .").
[24] *Id.*
[25] *Id.*
[26] Glazier Aff. ¶ 18, ECF No. 164-2; Johanson Aff. ¶ 18, ECF No. 164-3; Huang Aff. ¶ 19, ECF No. 164-4; Wang Aff. ¶ 18, ECF No. 164-5.
[27] Opp'n 6.
[28] ECF No. 2-1.

Legacy, Conversion against Global Legacy and Mr. Zhou, Trademark Infringement against all

Defendants, Trade Dress Dilution against all Defendants, Unjust Enrichment against Mr. Zhou,

Violation of U.C.A. § 48-3a-404 against Global Legacy, Readjustment of Capital Accounts and

Improper Distributions from the Operating Agreement against Global Legacy, Identity Theft

against Mr. Zhou, Accounting against Global Legacy, and Alter Ego against all Defendants.[29]

Plaintiffs have not served Mr. Zhou,[30] and he has not made an appearance in this case.

On November 7, 2022, Plaintiffs filed this motion for summary judgment.[31] Plaintiffs

seek summary judgment on their breach of contract claim ("Breach of Operating Agreement

against Global Legacy and [Mr.] Zhou") and their unjust enrichment claim.[32]

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "The court shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."[33] A fact is material if it "might affect the outcome of the

suit under the governing law."[34] A dispute regarding a material fact is genuine "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."[35]

At summary judgment, the court must "view the facts and draw reasonable inferences 'in

the light most favorable to the'" nonmoving party.[36] After doing so, "'[w]here the record taken

---

[29] ECF No. 134.
[30] ECF No. 159.
[31] Mot. Summ. J., ECF No. 141.
[32] *Id.* at 9, 11.
[33] Fed. R. Civ. P. 56(a).
[34] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[35] *Id.*
[36] *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654 (1962)).

as a whole could not lead a rational trier of fact to find for the nonmoving party,' summary judgment in favor of the moving party is proper."[37]

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."[38] "When the moving party has carried [this burden], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."[39] "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'"[40] The nonmoving party may do this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials."[41]

Of course, "[i]t is well settled in this circuit that [courts] can consider only admissible evidence in reviewing an order granting summary judgment."[42] So while a party "need not produce evidence in a form that would be admissible at trial, . . . the content or substance of the evidence must be admissible."[43]

Both parties object to exhibits attached to the motion and the response. The court discusses in turn the portions of each objection that are pertinent to the resolution of the motion.

---

[37] *Considine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1356 (10th Cir. 1994) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).
[38] *Celotex*, 477 U.S. at 323.
[39] *Matsushita*, 475 U.S. at 586.
[40] *Id.*at 587 (quoting Fed. R. Civ. P. 56(e)).
[41] Fed. R. Civ. P. 56(c).
[42] *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998) (quoting *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995)).
[43] *Id.* (quoting *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995)).

6

## I.  Plaintiffs' Exhibits

Plaintiffs have attached two exhibits to their motion for summary judgment. The first is the Operating Agreement of Viiva Global, LLC.[44] The second is titled "Bank Statements and Internal Company Documents."[45] Global Legacy objects "to the documents attached to Plaintiffs' Motion for Summary Judgment on the grounds that the subject documents lack foundation to be admissible as evidence."[46]

In the Tenth Circuit,

> In order for documents not yet part of the court record to be considered by a court in support of or in opposition to a summary judgment motion they must meet a two-prong test: (1) the document must be attached to and authenticated by an affidavit which conforms to Rule 56(e); and (2) the affiant must be a competent witness through whom the document can be received into evidence. . . . Documentary evidence for which a proper foundation has not been laid cannot support a summary judgment motion, even if the documents in question are highly probative of a central and essential issue in the case.[47]

In *In re Harris*, the court of appeals considered whether credit applications and credit agreements attached to a motion for summary judgment were admissible when there was no attached affidavit authenticating them.[48] The documents were not part of the record prior to the motion, and the opposing party objected to their admissibility.[49] The court noted the copies were "not self-authenticating and not intrinsically trustworthy."[50] Further, the documents were "in no

---

[44] ECF No. 141-2.
[45] ECF No. 141-3.
[46] Opp'n 3.
[47] *In re Harris*, 209 B.R. 990, 996 (B.A.P. 10th Cir. 1997) (quoting 11 James Wm. Moore et al., *Moore's Federal Practice* §§ 56.10[4][c][i] & 56.14 [2][c] (3d ed.1997)).
[48] *Id.* at 996–97.
[49] *Id.*
[50] *Id.* at 997.

way identified by a witness" for the movant.[51] For these reasons, the Tenth Circuit affirmed the trial court's decision not to consider them for purposes of summary judgment.[52]

Regarding the Operating Agreement, Plaintiffs did not attach an affidavit identifying it.[53] Yet the Operating Agreement already is part of the record—it was attached to the initial complaint.[54] And in its Answer, Global Legacy acknowledged that the "Operating Agreement speaks for itself"[55] and never contested the exhibit's authenticity. Therefore, the court may consider it on summary judgment.

Turning to the "Bank Statements and Internal Company Documents" exhibit, it consists of three categories of documents. The first category contains only a single document. The document, which lacks any identifying information such as a letterhead, simply has a table with three columns purporting to show "Date," "Entity," and "Amount," with a total row at the end.[56] The second category of documents contains bank statements from Zions Bank and Chase Bank. The bank records show transactions for "VIIVALLC" and include a date, amount, and description.[57] Within these records, there are highlighted line-item transactions.[58] For example, one highlights a date of 8/18, an amount of $647,689.43 and a description that reads, "WIRE/OUT . . . BNF Global Legacy LLC; OBII Commissi. [sic]."[59] The third category of documents contains "OA System" documents.[60] These documents are partially in English—some

---

[51] *Id.*
[52] *Id.*
[53] After Global Legacy's objection, Plaintiffs included four affidavits with their reply, but not one of the four affidavits identifies the Operating Agreement or the "Bank Statements and Internal Company Documents." ECF Nos. 164-2–164-5.
[54] ECF No. 2-3.
[55] Answer ¶¶ 27, 79, 85, 88, ECF No. 145.
[56] Table, ECF No. 141-3 at 1.
[57] *See, e.g.*, ECF No. 141-3 at 2.
[58] *Id.*
[59] *Id.*
[60] *See, e.g.*, ECF No. 141-3 at 3.

have only a few words in English—and purportedly detail where funds should be wired and their purpose. Plaintiffs did not attach an affidavit authenticating any of these documents, and the documents were not already a part of the record (or at least Plaintiffs have not shown that they are). Therefore, Plaintiffs have failed to establish the foundation for the "Bank Statements and Internal Company Documents" exhibit, and the court cannot consider it for purposes of summary judgment.

## II.    Defendant's Exhibits

In its opposition, Global Legacy attached a declaration of Viiva's Financial Director, Jing Luo.[61] Plaintiffs object to the declaration because it is "replete with hearsay and statements made without personal knowledge."[62]

Federal Rule of Evidence 602 provides that, "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."[63] "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."[64] Federal Rule of Evidence 802 generally bars its admission.[65]

In Ms. Luo's affidavit, she states that she has been Viiva's Financial Director since May 1, 2021.[66] She discusses her understanding of the Operating Agreement and "how the terms . . . have been implemented by the company."[67] She explains that Viiva's members and market

---

[61] ECF No. 161-2.
[62] Reply 3.
[63] Fed. R. Evid. 602.
[64] *Id.* at 801(c).
[65] *Id.* at 802.
[66] Luo Decl., ECF No. 161-2.
[67] *Id.* at 2.

leaders met in 2019, and that a copy of the minutes of that meeting is attached as an exhibit.[68] Ms. Luo then interprets a provision in the Operating Agreement in the context of the 2019 meeting minutes.[69] She details Viiva's operations, in particular its structure and its method for calculating commissions.[70] She explains the risk management fund[71] and the process by which Viiva calculates and allocates Top Company Position commissions "under Exhibit D."[72]

As Financial Director, Ms. Luo has personal knowledge of Viiva's financial processes; her testimony on those procedures is admissible. To the extent her statement contains legal conclusions as to the operation of Exhibit D and the Operating Agreement, those interpretations are not binding on the court.

Regarding the 2019 meeting, Global Legacy does not supply facts showing that Ms. Luo has personal knowledge of the meeting, as Ms. Luo does not state that she attended the meeting or had any role regarding it. Such personal knowledge would be necessary for her to lay the foundation for the "October 16, 2019 Minutes – Global Shareholders' Meeting" exhibit.[73] She also does not lay an adequate foundation for the 2019 minutes as business records.[74]

Likewise, Ms. Luo fails to establish her personal knowledge of either the purported "risk management fund" held by Global Legacy or Global Legacy's financial transactions. Ms. Luo does not state that she is employed by Global Legacy or had any role with the "risk management fund." Because Ms. Luo does not state any factual basis showing her personal knowledge of

---

[68] *Id.* at 2–3.
[69] *Id.* at ¶¶ 29, 32–39.
[70] *Id.* at 3–5.
[71] *Id.* at 5–7.
[72] *Id.* at 5–6.
[73] ECF No. 161-3.
[74] *See United States v. Ary*, 518 F.3d 775, 786 (10th Cir. 2008).

these topics, the court will not consider her testimony on them, nor the "Cathay Bank Wire Transfer" exhibit purporting to show Global Legacy's transactions.[75]

Finally, Mr. Luo does not establish her personal knowledge about the purported commission payments to Mr. Glazier and Mr. Johanson; she states only that she is "aware" they received commission payments and does not clarify how she became aware.[76] Because the exhibit that purports to show these commission payments is illegible,[77] it is not clear the alleged commission payments were even made during the time period Ms. Luo has been Viiva's Financial Director: from May 2021 onward.[78] Therefore, the court will not consider her testimony about these purported payments to the managers of two of the plaintiffs.

In conclusion, the Operating Agreement and the identified portions of Ms. Luo's declaration are admissible evidence for the purposes of summary judgment. The "Bank Statements and Internal Company Documents" exhibit[79] is inadmissible. Ms. Luo's statements about the risk management fund, the 2019 meeting, and any commission payments made to Plaintiffs' managers, as well as the "October 16, 2019 Minutes – Global Shareholders' Meeting,"[80] "Cathay Bank Wire Transfers,"[81] and "Commission payments – Devin Glazier & Craig Johanson"[82] exhibits are inadmissible.

## DISCUSSION

According to Plaintiffs, their "Motion for Summary Judgment is very focused, narrow, and very simple."[83] They seek judgment on two causes of action: breach of the Operating

---

[75] ECF No. 161-7.
[76] Luo Decl. ¶ 54.
[77] ECF No. 161-9.
[78] Luo Decl. ¶ 1.
[79] ECF No. 141-3.
[80] ECF No. 161-3.
[81] ECF No. 161-7.
[82] ECF No. 161-9.
[83] Reply 2.

Agreement against Global Legacy and Mr. Zhou, and unjust enrichment against Mr. Zhou.[84]

They ask for the four minority members to be awarded $1,801,940.87 each for a total of

$7,207,763.48, in addition to their attorney's fees and costs.[85]

## I.    Breach of Contract

"The elements of a prima facie case for breach of contract are (1) a contract, (2)

performance by the party seeking recovery, (3) breach of the contract by the other party, and (4)

damages."[86] Plaintiffs argue that "[e]ach element is met here" because the Operating Agreement

is a contract, Plaintiffs performed as required in order to receive commissions under Exhibit D,

"and the Defendants breached the contract by engaging in self-dealing and paying himself but

refusing to pay [P]laintiffs the commissions they are entitled to under Part 1 of Exhibit D, which

has caused obvious, easily quantified, and significant damage to Plaintiffs."[87] Plaintiffs'

argument fails because Plaintiffs have not supplied the requisite information needed to determine

what amount of the commission payments distributed to Global Legacy were pursuant to Part 1

of Exhibit D.

The Operating Agreement allows for Viiva to distribute commissions to members under

Exhibit D.[88] Exhibit D states that there will be a "calculation of commissions" and then, after

that calculation occurs, provides a mechanism for determining the amount of those commissions

to be distributed to each member.[89] For ease of discussion, the court will refer to the total amount

of commissions available to be dispersed under Exhibit D as "Total Calculated Commissions."

---

[84] Mot. Summ. J. 9, 11.
[85] *Id.* at 13.
[86] *Daz Mgmt., LLC v. Honnen Equip. Co.*, 2022 UT 15, ¶ 29 n.26, 508 P.3d 84, 91 (quoting *Richards v. Cook*, 2013 UT App 250, ¶ 7, 314 P.3d 1040). Neither party disputes that Utah law applies to this case, and the Operating Agreement contains a choice of law provision identifying Utah law as governing the agreement. *See* Operating Agreement 38.
[87] Mot. Summ. J. 9.
[88] Operating Agreement 29; Exhibit D to Operating Agreement, ECF No. 141-2 at 54.
[89] Exhibit D to Operating Agreement, ECF No. 141-2 at 54.

Exhibit D creates a two-part system for determining the amount of the Total Calculated Commissions due to each member.[90] Part 1 is straight-forward: 50% of the Total Calculated Commissions is distributed in equal shares to the five members.[91] Part 2 requires the remaining 50% of the Total Calculated Commissions to be distributed according to attributed relationships as evidenced by the Sponsorship Volume Report, a more complex calculation that is not detailed in the Operating Agreement.[92] Plaintiffs only seek summary judgment under Part 1.[93]

In order to prevail on summary judgment, Plaintiffs were required to establish the amount that Viiva paid Global Legacy in commissions pursuant to Part 1 of Exhibit D. Purporting to do this, Plaintiffs point to the total amount of commissions received by Global Legacy and Mr. Zhou ($3,603,881.74) and then argue that half of that total ($1,801,940.87) is attributable to commissions under Part 1 of Exhibit D.

Plaintiffs offer no evidence to support this calculation, and Exhibit D is not structured so that 50% of a member's received commissions is always from Part 1. Instead, Exhibit D provides that 50% of the Total Calculated Commissions is to be shared equally among members under Part 1. Under Part 2, the remaining 50% of the Total Calculated Commissions is to be shared according to the volume produced by the member's "attributed relationships." Therefore, the amount received by Global Legacy (or any member) under Exhibit D is not necessarily half from Part 1 and half from Part 2. In order to determine the amount of Part 1 commissions, Plaintiffs would have needed to offer evidence of the Total Calculated Commissions or the portion of commissions received by Global Legacy *under Part 1*. With evidence only of Global Legacy's

---

[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] Mot. Summ. J. 11.

13

commissions (and no evidence about how much was paid under Parts 1 and 2 of Exhibit D), the court cannot determine the amount owed to the minority members under Part 1.

For example, imagine the Total Calculated Commissions were $100 and there were five members. Under Part 1, 50% of the $100 would be split equally among the five members, with each member receiving $10. Part 2 requires consulting the Sponsorship Volume Report. Imagine the report shows that 92% of the Total Calculated Commissions were attributed to relationships of one of the members ("Member A"), and the remaining 8% were attributed equally to the relationships of the other four members. Under Part 2, Member A would receive $46, and the other members would each receive $1. This means that of the $100, Member A would receive a total of $56 and the other members would each receive a total of $11 under Exhibit D. As this example illustrates, the amount Member A received from Part 1 was not 50% of Member A's total received commissions; it was 17.9%. Likewise, the amount the minority members received from Part 1 was 91% of their total received commissions.

Now imagine that instead, there were no evidence of the Total Calculated Commissions or the Sponsorship Volume Report percentages. The only information available was that a member received $56. From this, it is simply impossible to determine the amount attributable to Part 1 or 2. It could be that the amount from Part 1 is $10, as in the first example. But it could also be that the amount from Part 1 is $50—as it would be if the Total Calculated Commissions were $500, and this member were attributed 2.4% from the Sponsorship Volume Report—or $28—as it would be if Total Calculated Commissions were $280, and this member were attributed 20% from the Sponsorship Volume Report—or numerous other values between $0 and $56. It is undeterminable.

And that is precisely the issue here. The lack of required data makes the calculation impossible. It is undisputed that Global Legacy received more than $3,000,000 in Top Company Positions commissions pursuant to Exhibit D, but there is no evidence presented of how much of that sum is pursuant to Part 1 or Part 2. Plaintiffs reason that half of those commissions must be pursuant to Part 1 because Part 1 details how half of Viiva's Total Calculated Commissions are to be shared. But, as demonstrated above, this math does not work.

The certain sum that Viiva transferred to Global Legacy *under Part 1* of Exhibit D is a material fact for purposes of this motion because damages are an element of a breach of contract claim. Yet Plaintiffs do not provide the record evidence supporting it. Plaintiffs' claim that their Part 1 damages are "easily quantified" is belied by their motion. And Plaintiffs' argument that they are each clearly owed at least $1,801,940.87 is without any evidentiary basis at all. Plaintiffs are not entitled to summary judgment on their breach of contract claim.

## II.    Unjust Enrichment

In "the alternative or in addition to the claims for breach of contract," Plaintiffs argue that "[t]he unilateral payment to [Mr. Zhou] of commissions (requested by [Mr. Zhou]) is unquestionably unjust enrichment to [Mr. Zhou]."[94] According to Plaintiffs, "the correct and full payment of the Part 1 commission to the remaining shareholders is a proper remedy to address the unjust enrichment of [Mr. Zhou] under Part 1 of Exhibit 'D.'"[95]

"The doctrine [of unjust enrichment] is designed to provide an equitable remedy where one does not exist at law,"[96] so "where 'an express contract covering the subject matter of the

---

[94] Mot. Summ. J. 12.

[95] *Id.*

[96] *Selvig v. Blockbuster Enterprises, LC*, 2011 UT 39, ¶ 30, 266 P.3d 691, 698 (quoting *Am. Towers Owners Ass'n v. CCI Mech., Inc.*, 930 P.2d 1182, 1193 (Utah 1996)) (alteration in original).

litigation' exists, recovery for unjust enrichment is not available.'"[97] When there is no such express contract, "[i]n order to prevail on a claim for unjust enrichment, three elements must be met":[98]

> First, there must be a benefit conferred on one person by another. Second, the conferee must appreciate or have knowledge of the benefit. Finally, there must be "the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."[99]

"For an unjust enrichment claim, the . . . purpose is to restore to the plaintiff the benefit he or she conferred upon the defendant, when the retention of this benefit would be unjust."[100]

For the first time in this litigation, Global Legacy takes the position that the Operating Agreement is unenforceable.[101] The issue is insufficiently briefed. Assuming for the purposes of this motion only that the Operating Agreement were found to be unenforceable, the prospect of an unjust enrichment claim would be on the table. But Plaintiffs' motion for summary judgment on the grounds of unjust enrichment suffers from a fatal defect: the motion contends that Mr. Zhou "conferred upon himself a benefit" by directing commissions from Viiva to himself.[102] Plaintiffs assert that the "correct and full payment of the Part 1 commission to the remaining shareholders [sic] is a proper remedy to address the unjust enrichment of [Mr. Zhou]."[103] But, contrary to Plaintiffs' assertion, that would not be a proper remedy, because Plaintiffs do not assert that the *minority members* conferred a benefit on Mr. Zhou—they allege that *Mr. Zhou* did

---

[97] *Id.* (quoting *Mann v. Am. W. Life Ins. Co.*, 586 P.2d 461, 465 (Utah 1978)).
[98] *Desert Miriah, Inc. v. B & L Auto, Inc.*, 2000 UT 83, ¶ 13, 12 P.3d 580, 582 (citing *Berrett v. Stevens*, 690 P.2d 553, 557 (Utah 1984)).
[99] *Id.* (quoting *Berrett v. Stevens*, 690 P.2d 553, 557 (Utah 1984)).
[100] *Jones v. Mackey Price Thompson & Ostler*, 2015 UT 60, ¶ 57, 355 P.3d 1000, 1016 (citing Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a (2011)).
[101] Opp'n 15–18.
[102] Mot. Summ. J. 12.
[103] *Id.*

or *Viiva* did. Without the minority members having conferred a benefit on Mr. Zhou, the first element of unjust enrichment is not met as to them. The requested payment to the minority members is simply not available under their unjust enrichment theory.

There is another issue with the claim of unjust enrichment. Plaintiffs assert the claim solely against Mr. Zhou in their Third Amended Complaint.[104] However, Plaintiffs have not served Mr. Zhou and do not expect to serve Mr. Zhou.[105] While Plaintiffs assert that Global Legacy is an alter ego of Mr. Zhou,[106] Plaintiffs failed to make this argument until their reply brief.[107]

"This court does not ordinarily review issues raised for the first time in a reply brief."[108] This is because "[i]t robs the [opposing party] of the opportunity to demonstrate that the record does not support [the reply's] factual assertions and to present an analysis of the pertinent legal precedent that may compel a contrary result."[109] "The rule also protects this court from publishing an erroneous opinion because [it] did not have the benefit of the [opposing party's] response."[110] And "[w]hen issues are not adequately briefed, they are deemed waived."[111]

Again, Plaintiffs first raised the alter ego argument in their reply. While they devote two pages to the argument, Plaintiffs fail to cite to any legal authority to support their position.[112] Further, Plaintiffs do not point to any record evidence. For these reasons, the court finds that Plaintiffs have waived this argument for purposes of this motion.

---

[104] Third Am. Compl. 19.
[105] ECF No. 159.
[106] Third Am. Compl. 24; Reply 15–16.
[107] Reply 15–16.
[108] *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) (citing *Headrick v. Rockwell Intern. Corp.*, 24 F.3d 1272, 1278 (10th Cir. 1994)); *see Deseret Tr. Co. v. Unique Inv. Corp.*, 2018 WL 8110959, at *3 (D. Utah 2018).
[109] *Stump*, 211 F.3d at 533.
[110] *Id.*
[111] *Petrella v. Brownback*, 787 F.3d 1242, 1260 (10th Cir. 2015).
[112] *See* Reply 15–16.

Finding that Plaintiffs have not prevailed on this motion for summary judgment, their request for attorney's fees is denied.

### ORDER

IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment is DENIED.

Signed February 15, 2023.

BY THE COURT

_____

David Barlow
United States District Judge

18